UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                     :

SINADE WADSWORTH,                               :

                         Plaintiff,                     :

                -v-                            :            24 Civ. 9249 (JPC) (OTW)

                                            :

NEW YORK CITY DISTRICT COUNCIL OF      :          OPINION AND ORDER
CARPENTERS AND JOINERS OF AMERICA,     :

                                          :

                     Defendant.                 :

                                          :
-----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Plaintiff Sinade Wadsworth brings this suit against Defendant New York City District Council of Carpenters and Joiners of America, challenging the conditions and conclusion of her former employment.  Defendant has moved to dismiss one of Plaintiff's four claims, for whistleblower retaliation under the New York Labor Law ("NYLL").  *See* N.Y. Lab. L. § 740.  An element of that cause of action is that the employee must have disclosed or threatened to disclose the suspected illegal activity to a *supervisor* of her employer.  Because Plaintiff does not allege that she did so, or that any exception to the employer-notification requirement applies, Defendant's motion is granted.

## I. Background

### A.   Facts[1]

Plaintiff is a member of Defendant, a regional labor union overseeing nine local unions. Am. Compl. ¶¶ 1, 5.  She worked as a carpenter from August 2012 until October 2018, when she was hired by Defendant's union organizing group—known as Area Standards—to be what is called an Organizer.  *Id.* ¶¶ 1, 6.  As an Organizer, Plaintiff's main job duties were to, among other things, increase union membership, encourage developers to hire union workers for upcoming construction projects, and raise awareness that nonunion carpenters were being paid less than union wages by conducting demonstrations involving inflatable rats at nonunion sites.  *Id.* ¶ 10.

At the time of Plaintiff's employment, Defendant's hierarchical structure was as follows: Organizers like Plaintiff reported to Area Standards Managers, who in turn reported first to Eddie McWilliams, the head of Area Standards, and then after McWilliams's June 2021 retirement to Defendant's President, Paul Capurso.  *Id.* ¶¶ 7-9.  McWilliams and Capurso, in turn, reported to Defendant's top executive, Executive Secretary-Treasurer Joseph Geiger.  *Id.* ¶ 7.

Plaintiff alleges that, from September 2021 onwards, she and her fellow Organizer, Tamara Rivera, were discriminated against by Area Standards Managers, including Michael Piccirillo, who exhibited "anti-female bias."  *Id.* ¶¶ 10, 12-42.  Piccirillo's alleged discrimination led to a September 15, 2023 meeting with Plaintiff and Defendant's head of human resources, Rebecca Seidner, at which Piccirillo reprimanded Plaintiff for various activities and required Plaintiff to

---

[1] The facts contained in this section, which are assumed true solely for purposes of this Opinion and Order, are taken from Plaintiff's Amended Complaint, Dkt. 21 ("Am. Compl."). *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

ask for permission should she seek to meet with contractors, developers, and elected officials. *Id.* ¶¶ 43-45. After that meeting, Plaintiff emailed Seidner that she no longer felt safe working around Piccirillo. *Id.* ¶ 47. At a follow-up meeting on November 6 between Seidner, Plaintiff, and Defendant's Vice President of Operations, Matthew Walker, Walker told Plaintiff that she needed to follow Piccirillo's directions and did not otherwise address Piccirillo's conduct, but assured Plaintiff that there would be no further issues with him. *Id.* ¶¶ 20, 48-49.

Two days after the meeting with Walker, on November 8, Plaintiff was informed by Defendant's Office of the Inspector General ("OIG") that it had started an investigation of her and asked that she turn in her cell phone and laptop. *Id.* ¶¶ 50, 54. Plaintiff believed that Piccirillo instigated the investigation by making a false allegation of a kickback Plaintiff was to receive from a program she had introduced to Defendant. *Id.* ¶ 55. The next day, November 9, Plaintiff took a leave of absence, explaining to Seidner that she was uncomfortable working with Piccirillo. *Id.* ¶ 56. Seidner told Plaintiff to come back to the office for a meeting with Walker; at that meeting, which took place on November 20, Plaintiff asked Walker to be transferred out of Area Standards, but Walker denied her request and reiterated that she would have no further issues with Piccirillo. *Id.* ¶¶ 58-60.

Also on November 20, Plaintiff met with Inspector General Richard Green, the head of OIG, who told her that OIG had found nothing "that would stop her from doing her job." *Id.* ¶¶ 50, 61. During that meeting, Plaintiff asked Green how a man named Joseph Spinnato had learned about OIG's investigation of her; Green denied that anyone in OIG had discussed this information with Spinnato. *Id.* ¶¶ 68, 72. Plaintiff further flagged a past link between Spinnato and Robert Anton, one of Green's investigators in OIG: Anton had been Spinnato's parole officer. *Id.*

Plaintiff first met Spinnato a few months before, in September 2023, at a meeting with

3

contractors about the Gateway Tunnel infrastructure project. *Id.* ¶ 68. Plaintiff alleges that, after doing some research, she learned that Spinnato had organized crime connections and had been convicted of mail fraud. *Id.* ¶ 69. She also learned that Spinnato spoke regularly to Anton, the OIG investigator who was previously a parole officer in New York City. *Id.* ¶¶ 68, 70. Crediting Plaintiff's allegations of Spinnato's connections to organized crime, Spinnato's relationship with Anton was potentially problematic for Defendant, as Defendant is subject to a consent decree which prohibits all its "current and future officers, employees, and members" from "knowingly associating with any member or associate of" a "criminal group," like "La Cosa Nostra crime family." Dkt. 24 ("Erlanger Decl."), Exh. 2 ("Consent Decree") ¶ 2(b); *see United States v. Dist. Council of N.Y.C. & Vicinity of Utd. Bhd. of Carpenters & Joiners of Am.* ("*Dist. Council*"), No. 90 Civ. 5722 (VM) (S.D.N.Y. Mar. 4, 1994), Dkt. 410; *see generally* Am. Compl. ¶¶ 62-67. By way of subsequent stipulations and orders appointing him as Independent Monitor, Glen G. McGorty, a partner with the law firm Crowell & Moring, is authorized to ensure Defendant's compliance with the consent decree. *See* Erlanger Decl., Exh. 3 ("11/18/14 Stipulation") ¶¶ 3(b), 5; Erlanger Decl., Exh. 4 ("7/1/22 Stipulation") ¶¶ 3, 5; *see also Dist. Council*, Dkts. 1595, 1877.[2] Under the consent decree and those stipulations, Defendant's "[r]epresentatives, officers, and employees" must "promptly report" to both OIG and the Independent Monitor "any known or suspected violations of the Consent Decree," and if "the Independent Monitor receives

---

[2] The consent decree and the stipulations are incorporated by reference into the Amended Complaint, *see* Am. Compl. ¶¶ 62-64, 67, and thus are properly considered at this stage. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *La Vigne v. Costco Wholesale Corp.*, 284 F. Supp. 3d 496, 502 (S.D.N.Y. 2018), *aff'd*, 772 F. App'x 4 (2d Cir. 2019). Similarly, a court may consider "documents . . . of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted) (emphasizing that a plaintiff's "*reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion").

communications from officers, employees, members, contractors, or any third parties with respect to [Defendant], the Independent Monitor will refer such communications to [OIG] for appropriate follow-up investigation and action, unless in the Independent Monitor's sole discretion, some other course of action is warranted."  7/1/22 Stipulation ¶ 5(d)(i).

Plaintiff brought up the Spinnato-Anton relationship with an Area Standards Business Agent and three retired Organizers, who told her that the connection was improper.  Am. Compl. ¶¶ 18, 69.  She also spoke about it to Shane McDermott, a local union shop steward.  *Id.* ¶ 70.  On December 6, 2023, McDermott allegedly emailed David Burroughs—the Independent Monitor's chief investigator, who works at StoneTurn—along with Geiger (Defendant's top executive), Capurso (its President), and others about "whispers" of organized crime and corruption in OIG. *Id.* ¶¶ 66, 73.  But in that email, McDermott did not reveal his source or Anton's name.  *Id.* ¶ 73. Plaintiff contends that McDermott later called Burroughs to discuss the Spinnato-Anton relationship specifically, and Burroughs replied that Anton is an "organized crime specialist."  *Id.* ¶ 74.

With McDermott's encouragement, Plaintiff spoke to Burroughs on December 7 and 8, both about OIG's investigation of her and the Spinnato-Anton relationship.  *Id.* ¶ 75.  Burroughs received Plaintiff's permission to speak to OIG about both subjects.  *Id.*  On December 11, Burroughs informed Plaintiff that he was still waiting to hear back from OIG.  *Id.* ¶ 76.

That evening, Plaintiff took a call from Geiger, who wanted to meet with her the next day. *Id.*  So the two met on December 12, when Geiger discussed both Piccirillo's treatment of Plaintiff and OIG's investigation into her.  *Id.* ¶¶ 77, 79.  Geiger apparently understood "that there was no need for further inquiry."  *Id.* ¶ 79.

A week later, on December 19, Plaintiff was summoned to a meeting with Walker,

Defendant's Vice President of Operations. *Id.* ¶ 80. Also present at that meeting were Capurso and Seidner, the human-resources executive. *Id.* Walker told Plaintiff that her office would be moved upstairs to the executive floor and that he—and not Piccirillo—would deal with her time-off requests from then on. *Id.* But after that meeting, Plaintiff alleges, Capurso closely monitored her activities by scrutinizing her time sheets, questioning her about whom she had spoken with, and demanding details of the meetings she attended. *Id.* ¶ 81.

Ultimately, on January 12, 2024, Walker ordered Plaintiff to move from the executive floor back down to Area Standards, where Plaintiff would once again have to interact with Piccirillo. *Id.* ¶ 83. Because of this order, Plaintiff resigned the same day, even though she did not have another job lined up. *Id.* Plaintiff asserts that she was "compelled to resign . . . under tremendous psychological pressure" and that by the time she resigned, she was Defendant's lone remaining female Organizer. *Id.* ¶¶ 3-4.

## B.    Procedural History

Plaintiff first filed a complaint against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Am. Compl. ¶ 84. She received a Notice of Right to Sue from the EEOC on September 6, 2024. *Id.* Plaintiff then filed suit against Defendant on November 4, 2024, in the Supreme Court of the State of New York, New York County. Dkt. 1-1 ("Compl."). The original Complaint asserted four causes of action: hostile work environment in violation of Title VII, *id.* ¶¶ 53-63; adverse employment action under Title VII, *id.* ¶¶ 64-66; discrimination under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*, Compl. ¶¶ 67-70; and discrimination under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, Compl. ¶¶ 71-76.

Defendant removed the case to this Court on December 4, 2024, Dkt. 1, and answered the original Complaint on December 11, 2024, Dkt. 4.  The parties since have engaged in discovery. Dkts. 19, 27, 29.  On March 17, 2025, Plaintiff filed her Amended Complaint.  Dkt. 21.  The Amended Complaint also asserts four causes of action: discrimination under Title VII, Am. Compl. ¶¶ 85-97; discrimination under the NYSHRL, *id.* ¶¶ 98-101; discrimination under the NYCHRL, *id.* ¶¶ 102-106; and whistleblower retaliation under the NYLL, *id.* ¶¶ 107-119.  In other words, the Amended Complaint combined the original two Title VII claims into one cause of action and added the retaliation claim.  *Compare id.* ¶¶ 85-119, *with* Compl. ¶¶ 53-76.

On April 4, 2025, Defendant moved to dismiss only the whistleblower-retaliation claim. Dkts. 22, 23 ("Motion").  Plaintiff responded on April 18, 2025.  Dkt. 25 ("Opposition"). Defendant replied on April 25, 2025.  Dkt. 26 ("Reply").

## II.  Standard of Review

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although a court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

### III.  Discussion

Defendant moves to dismiss only Plaintiff's whistleblower-retaliation claim under NYLL Section 740.  As Section 740 states, an "employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because" the employee "discloses or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation." N.Y. Lab. L. § 740(2)(a).  But this "protection against retaliatory action . . . pertaining to disclosure to a public body shall not apply to an employee who makes such disclosure to a public body unless the employee has made a good faith effort to notify his or her employer by bringing the activity, policy or practice to the attention of a supervisor of the employer," thus giving the employer "a reasonable opportunity to correct such activity, policy or practice."  *Id.* § 740(3).  There are five exceptions to the employer-notification requirement, like when "the employee reasonably believes that reporting to the supervisor would result in a destruction of evidence or other concealment of the activity, policy or practice," or when "the employee reasonably believes that the supervisor is already aware of the activity, policy or practice and will not correct such activity, policy or practice."  *Id.* § 740(3)(a)-(e).

Put together, "[t]o state a claim under Section 740, a plaintiff must plead: (1) that she disclosed or threatened to disclose an activity, policy, or practice of the employer that the employee at least reasonably believed was illegal; (2) an employer's retaliatory action; and (3) some causal connection between the employee's action and the employer's retaliatory action."  *Alam v. Fairstead Mgmt. LLC*, No. 24 Civ. 849 (NRB), 2025 WL 622587, at *11 (S.D.N.Y. Feb. 26, 2025) (internal quotation marks omitted).  As for the first element, "while an employee need not specify the actual law, rule or regulation violated when making a complaint to a supervisor, she must

8

identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct." *Id.* (citation modified). Said differently, where an exception to the employer-notification requirement does not apply, a plaintiff must plead that she brought the purportedly illegal activity, policy, or practice to the attention of a supervisor of the employer. *See, e.g.*, *Palmer v. eCapital Corp.*, No. 23 Civ. 4080 (DEH), 2024 WL 3794715, at \*13 (S.D.N.Y. Aug. 13, 2024) (explaining that the plaintiff did not adequately plead "the elements of a whistleblower claim" under Section 740 where she failed "to allege that she disclosed or threatened to disclose to any *supervisor* any alleged violation of law, rule or regulation").

This requirement dooms Plaintiff's Section 740 claim. Plaintiff does not plead that an exception to the employer-notification requirement applies, so she must allege that she brought the Spinnato-Anton relationship to the attention of a supervisor of Defendant. She claims that "Burroughs, McGorty, and Green were 'supervisors,' as contemplated" by Section 740. Am. Compl. ¶ 113; *see* Opposition at 14-16. But Burroughs and McGorty do not meet the statutory definition of "supervisor": Section 740 defines supervisor as "any individual *within an employer's organization* who has the authority to direct and control the work performance of the affected employee; or who has managerial authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains." N.Y. Lab. L. § 740(1)(f) (emphasis added). Even assuming that Burroughs and McGorty, through their Independent Monitor work, had the authority "to take corrective action" about purported violations of the consent decree, *see* Opposition at 14-16 (emphasizing this point), they were not "within" Defendant's "organization." Rather, as Plaintiff herself pleads, they respectively worked for StoneTurn and Crowell & Moring at the time Plaintiff reported the Spinnato-Anton relationship. Am. Compl. ¶¶ 64, 66. (Indeed,

9

they served as Defendant's *Independent* Monitor.) Yet, Section 740 is clear that a supervisor must be employed by the employer. *See* N.Y. Lab. L. § 740(1)(f) ("within an employer's organization"), (3) ("supervisor of the employer"). Because Burroughs and McGorty are "not strictly employed" by Defendant—as Plaintiff concedes, Opposition at 16—they are not supervisors whom Plaintiff must have notified under Section 740. *See Palmer*, 2024 WL 3794715, at *13 & n.9 (disclosing an alleged legal violation to Defendant's lenders rather than Defendant's supervisors did not suffice).[3]

That leaves Green, the Inspector General. There is no dispute that he is a supervisor under Section 740. *See* Reply at 5 (conceding this point). But as Defendant points out, Plaintiff does not allege that she brought the continuing Spinnato-Anton relationship to Green's attention. Motion at 9. Instead, at her November 20, 2023 meeting with Green, Plaintiff "informed" him only that "Anton had been Spinnato's parole officer." Am. Compl. ¶ 72. Such a historical connection, occurring when Anton held his prior position as a parole officer—and not his current role with Defendant's OIG—would not violate the consent decree's provision prohibiting Defendant's "current and future officers, employees, and members" from "knowingly associating with any member or associate of" a "criminal group." Consent Decree ¶ 2(b). As alleged, Plaintiff did not inform Green, for instance, that Spinnato and Anton continued to communicate once Anton joined Defendant as an investigator for OIG, which would be the kind of activity that conceivably violates the consent decree. *Cf.* Am. Compl. ¶¶ 69, 70, 75 (allegations that Plaintiff spoke directly to non-supervisors, like Burroughs, about the Spinnato-Anton relationship).

---

[3] In addition to this fatal shortcoming preventing McGorty from being a supervisor of Defendant for purposes of Section 740, Plaintiff also does not allege that the Spinnato-Anton relationship was brought to his attention. *See generally* Am. Compl. Given the above holding, the Court need not reach whether, as Plaintiff argues, "[r]eporting a violation to Burroughs was the same as reporting it to McGorty." Opposition at 16.

10

Plaintiff does not argue to the contrary; rather, she argues that she notified Green through Burroughs.  Opposition at 15-16; *see* Am. Compl. ¶ 75 ("Burroughs requested and received [Plaintiff's] permission to speak with OIG on her behalf about the investigation of her and the Anton-Spinnato connection.").  To support this bank-shot theory, she relies on *Goldberg v. Bespoke Real Estate LLC*, No. 23 Civ. 5614 (JPO), 2024 WL 1256006, at *9 (S.D.N.Y. Mar. 25, 2024).  But *Goldberg* stands only for the proposition that an employee can notify a supervisor "indirectly through an intermediary or an agent, *such as counsel*," as in that case the plaintiff's counsel directly notified the supervisor.  *Id.* at *4, *9 (emphasis added).  No such formal agency or attorney-client relationship existed between Plaintiff and Burroughs.  Indeed, Plaintiff argues that if Burroughs was not her supervisor, then he was the representative of a "public body" to whom she also disclosed the Spinnato-Anton relationship.  Opposition at 16-17.  If that is the case, however, Section 740(3) is clear that for "such disclosure to a public body" to suffice, the employee still must have notified "a supervisor of the employer."  N.Y. Lab. L. § 740(3).  Plaintiff points to no other supervisor in that scenario.  And, as noted above, Plaintiff does not allege that any exception to Section 740's employer-notification requirement applies.  *See id.* § 740(3)(a)-(e).  Under the statute, then, Plaintiff cannot have notified Green through Burroughs.

Ultimately, because "Plaintiff fails to allege that she disclosed or threatened to disclose to any supervisor any alleged violation of a law, rule or regulation," she fails to state a claim under Section 740.  *Palmer*, 2024 WL 3794715, at *13 (emphasis omitted).[4]

---

[4] Given this holding, the Court does not reach whether Plaintiff's Amended Complaint adequately pleads the other elements of a whistleblower-retaliation claim under Section 740 of the NYLL.  *See* Motion at 5-7, 9-13 (arguing that the other elements are inadequately pleaded).

## IV.  Conclusion

For the above reasons, the Court grants Defendant's motion to dismiss Plaintiff's whistleblower-retaliation claim.  The Clerk of Court is respectfully directed to close Docket Number 22.

SO ORDERED.

Dated: December 29, 2025
New York, New York

_____
JOHN P. CRONAN
United States District Judge

12